IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PARCEL DELIVERY EXPRESS, INC.  *

    Plaintiff,  *

    v.  *    Civil Case No. 17–02418–JMC

VOLPE EXPRESS, INC.,  *

    Defendant.  *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

This case concerns a contractual dispute between Plaintiff Parcel Delivery Express, Inc. ("Plaintiff" or "PDX") and Defendant Volpe Express, Inc. ("Defendant" or "Volpe") over the collection of allegedly unpaid fees for transportation services that PDX provided to Volpe. The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c) and Local Rule 301.4. (ECF Nos. 15 & 22). Now pending before the Court is Plaintiff's Motion for Partial Summary Judgment. (ECF No. 17). In considering that Motion, the Court has also reviewed Defendant's Response in Opposition and Plaintiff's Reply. (ECF Nos. 20 & 25). A hearing was also held before the Court on March 29, 2018. (ECF No. 32); *see* Loc. R. 105.6 (D. Md. 2016). For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment will be DENIED.

**I. BACKGROUND**

Plaintiff Parcel Delivery Express, Inc. and Defendant Volpe Express, Inc. are motor carriers engaged in the interstate transportation and delivery business, providing transportation services to various consignees and shippers of freight throughout the Mid-Atlantic region. (ECF No. 2, Compl. at ¶¶ P3, P4, 2). On March 19, 2010, PDX and Volpe entered into the Interline Division Contract Agreement (the "Contract"). *Id.* at ¶ 1. Under the terms of the contract, PDX

would provide certain transportation services to Volpe's direct customers and vice versa, depending on the geographic location of the companies' customers. Essentially, PDX and Volpe acted as "interline carriers for one another so they could extend the reach of their transportation services for their customers." *Id.* at ¶ 2. In accordance with the percentage splits assigned in the Contract, PDX and Volpe would then pay one another for their share of the revenue from the transportation services provided to customers. *Id.* at ¶ 9. The Contract called for payments to be made within 30 days of the presentation of an invoice. (ECF No. 2–1 at ¶ 1). Occasionally, a third party carrier would be used to cover certain portions of the transportation route. On these occasions, PDX and Volpe would split the shipping charges according to a formula provided in the Contract. (ECF No. 17–1 at 4). This business partnership appears to have functioned well for both parties for a number of years. (ECF No. 2, Compl. at ¶ 9).

However, PDX alleges that, "by January of 2016, Volpe had fallen behind" on payments that were due to PDX under the Contract—i.e., Volpe was in breach of the 30-day payment provision of the contract. (ECF Nos. 17–1 at 7 & 2–1 at ¶ 1). Notwithstanding some payments from Volpe, PDX further alleges that 69 invoices, totaling $148,769.03, remain unpaid.[1] *Id.* For its part, Volpe admits to "fall[ing] behind on payment" due to "unforeseen issues with a workers' compensation settlement." (ECF No. 20 at 2, 5). But Volpe asserts that the companies reformed their original contract in 2016 to provide flexibility to Volpe to better allow for its continued repayment of past due amounts given its cash flow issues. *Id.* at 5. According to Volpe, under this reformed agreement, it paid down at least $150,000 of its past due amounts, although outstanding invoices remain unpaid. *Id.*

---

[1] Due to the nature of the contract, PDX admits that it also owes a sum in the amount of $3,542.44 to Volpe for Volpe's transportation services provided to PDX's customers. (ECF No. 17–1 at 1). Volpe claims that the amount due from PDX is in excess of $7,000. (ECF No. 20 at 6).

Volpe next asserts that, sometime in July of 2017, PDX became frustrated that it had not yet paid off all of its debt and "sought to unilaterally modify the parties' agreement [by refusing to service certain locations on Volpe's behalf] and threatened to terminate all business if the terms were not accepted." (ECF No. 20 at 2). Volpe admits that it made only one additional payment to PDX and was subsequently "unable to continue [repayment] without PDX's continued business." *Id.* at 2. PDX asserts both that Volpe's last payment was made on April 28, 2017 and that Volpe "stopped paying PDX altogether" in August of 2017. (ECF No. 17–1 at 11, 12).

On August 23, 2017, PDX filed suit against Volpe. (ECF No. 2, Compl.). PDX's complaint alleges breach of contract, breach of implied contract, quantum meruit/unjust enrichment, intentional interference with contractual relations, breach of trust, and breach of fiduciary duties of loyalty and care. *Id.* at 6–12. On November 9, 2017, PDX filed the currently pending Motion for Partial Summary Judgment as to Count I for breach of contract, Count II for breach of implied contract, and Count III for quantum meruit/unjust enrichment. (ECF No. 17).

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden "to demonstrate the absence of any genuine dispute of material fact." *Jones v. Hoffberger Moving Servs. LLC*, 92 F.Supp.3d 405, 409 (D. Md. 2015) (internal citations omitted). A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F.Supp.35 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The court is "required to view the facts and draw reasonable inferences in the light most favorable to" the nonmoving party, *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)), but must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Heckman v. Ryder Truck Rental, Inc.*, 962 F.Supp.2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## III. DISCUSSION

### A. Count I: Breach of Contract

Plaintiff first argues that Defendant breached the Contract by failing to pay carrier charges due to Plaintiff within 30 days under the payment structure in the Contract and, therefore, summary judgment should be granted in its favor. For its part, Defendant asserts that Plaintiff cannot now attempt to enforce the 2010 Contract's 30-day payment provision having essentially waived Defendant's prior breach of that condition and having agreed to a new payment arrangement to deal with its outstanding balance caused by the cash flow issue. Further, Defendant argues that Plaintiff's own unilateral decision to restrict certain types of services (and ultimately terminate all service) once Defendant's ability to pay in a timely fashion was called into question constituted yet a second modification of the 2010 Contract. The Court interprets this as an argument that Plaintiff breached the Contract, frustrating (and perhaps excusing) Defendant's responsibility to pay. Plaintiff answers that no modifications were made

to the Contract and that, at all times, Plaintiff was simply demanding the sums Defendant owed to it under the Contract and taking steps to mitigate further losses (when Plaintiff unilaterally modified then terminated its own performance). The Contract itself contains a clause stating that all amendments require mutual consent and must be negotiated in writing with 30 days prior notice absent an express agreement for a different effective date. (ECF No. 2–1 at ¶ 5).

The Maryland Court of Appeals has opined that "the freedom to contract is not limited to the contract as written," and instead "includes the freedom to alter that contract." *Hovnanian Land Inv. Group, LLC v. Annapolis Towne Centre at Parole, LLC*, 421 Md. 94, 121 (2011). "The parties to a contract may agree to vary its terms and enter into a new contract embodying the changes agreed upon and a subsequent modification of a written contract may be established by a preponderance of the evidence. Assent to an offer to vary, modify or change a contract may be implied and found from circumstances and the conduct of the parties showing acquiescence or agreement." *Cole v. Wilbanks*, 226 Md. 34, 38 (1961). This is true even in the face of a so-called "non-waiver clause" included in the contract. *Hovnanian Land*, 421 Md. at 121–22. Furthermore, "whether subsequent conduct of the parties amounts to a modification or waiver of their contract is generally a question of fact to be decided by the trier of fact." *Id.* at 122 (quoting *University Nat'l Bank v. Wolfe*, 279 Md. 512, 523 (1977)). In considering whether waiver or modification of a contract has occurred, courts "look to the totality of a party's actions." *Id.* "Given the highly factual nature" of this inquiry, "it is an uncommon case in which the issue can be resolved by summary judgment." *Id.*

In its Motion for Partial Summary Judgment, Plaintiff included an affidavit completed by Steve Buck, President and CEO of PDX, in which he states that "PDX never accepted nor proposed any changes to the terms of the Contract nor waived any of the amounts Volpe owed to

it under the terms of the Contract. The terms of the Contract have governed the parties' business relationship since the Contract was executed on March 19, 2010." (ECF No. 17–3 at ¶ 18). However, Mr. Buck also acknowledges that Defendant had been in breach of the Contract's 30-day payment provision beginning in February of 2016, and that as of that time Defendant "continually fell behind on their obligations under the Contract by sixty (60) or more days." *Id.* at ¶ 8. Mr. Buck described that by April 2016, Defendant was behind by 100 days and owed a total of $310,000 in past due invoices.[2] *Id.* at ¶ 9. This arrearage continued into the fall of 2016, at which point Mr. Buck informed Volpe that PDX wished to "accelerate the payment pace so we are at most 60-days behind by the end of January, although the end of the year would be better." *Id.* at ¶ 10. By July of 2017 (one month before suit was filed), Defendant's account aging was not at 60 days, but instead had crept up to 75 days past due. *Id.* at ¶ 11. At that point, Mr. Buck describes the conditions PDX imposed "for our continued relationship with Volpe":

> (1) PDX would not do any further linehauls with Volpe starting the night of 7/24/17; (2) PDX would not accept any freight going to the Richmond and/or Tidewater regions of Virginia, as it required PDX to float Volpe's payments to its partner in that area for over 40 days; (3) PDX would cut off inbound receipts for same day linehauls at 5 a.m. for Maryland and the District of Columbia, and would not guarantee any Virginia 2nd linehaul; and (4) PDX needed a check by the end of the day on July 24, 2017 to bring

---

[2] Furthermore, at the March 29, 2018 motions hearing before the Court, Plaintiff conceded that, rather than immediately file suit upon Defendant's failure to pay and breach of the Contract, it had attempted to "work with" Defendant to facilitate repayment "because [the parties' business relationship] was profitable for so many years for both parties."

> Volpe's account aging down to 45 days before it would accept any
> more transportation requests from Volpe.

*Id.*

While it certainly appears that Plaintiff never waived Defendant's indebtedness, there are factual issues regarding the terms of payment for that indebtedness. Mr. Buck's affidavit demonstrates that for almost a year and a half, Plaintiff not only tolerated Defendant's breach of the Contract's 30-day payment provision but, at various times, agreed to other arrangements, such as bringing the account aging down to 60 days, then (unilaterally, it appears) insisting on a 45-day arrangement. In the Court's view, there is at least a "reasonable inference" in favor of Defendant, the nonmoving party here, that the terms of the contract between Plaintiff and Defendant were therefore modified at some point in time and that new terms then governed the business relationship, at least as to the terms of payment. The particulars of the modification of payment terms (and whether, in fact, the Contract was modified at all) are disputed by the parties. It is also unclear whether and to what extent Defendant's admitted nonpayment breached any modified terms, and whether all of the alleged amount Plaintiff claims falls within the scope of any breach.[3] Therefore, the Court finds that summary judgment is inappropriate because a factual dispute remains as to which terms governed the parties' business relationship following Defendant's delinquency and inability to pay sums owed under the Contract and

---

[3] For example, if the new payment terms were 60 days, what amount, if any, of the claimed damages were beyond the 60-day window? As another example, was Plaintiff's unilateral attempt to change the payment window to 45 days a true modification, and, if so, how much of the claimed damages was beyond that window? As a final example, did Plaintiff's change in performance itself constitute a breach so as to excuse some or all of the nonpayment? In short, while it is undisputed that Defendant's account is still not current, it is far from clear how much, if any, of Defendant's nonpayment constitutes a breach at this point.

whether Defendant was in compliance with those terms. That factual dispute is for the jury to decide.[4]

### B. Count II: Breach of Implied Contract

Second, Plaintiff argues that it is entitled to summary judgment based on the implied contract between the parties. In considering motions for summary judgment in the context of express and implied contracts, the Maryland Court of Appeals has defined express contract as "an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in the distinct and explicit language, either orally or in writing." *County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94 (2000) (quoting *Black's Law Dictionary* 323 (6th ed. 1990)). In contrast, an implied contract is "an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men." *Id.* (internal quotations and citation omitted). *See also Klebe v. United States*, 263 U.S. 188, 192 (1923) ("A contract implied in fact is one inferred from the circumstances or acts of the parties; but an express contract speaks for itself and leaves no place for implications.").

To the extent that an implied contract existed between the parties here, and is not superseded by the express Contract between the parties, the terms of such implied contract are unclear for the same reasons as explained in detail above with regard to the express contract. With the terms unclear, the Court cannot determine as a matter of law that Defendant's

---

[4] As for Defendant's argument that Plaintiff's unilateral attempt in July of 2017 to modify which shipments it would take and under what circumstances, the Court need not reach that issue at this point given that it has already found summary judgment to be inappropriate. The Court would point out that the Contract itself does not seem to require either party to take all shipments of the other's. Again, however, the parties' course of conduct in this regard would be important to know yet is not before the Court. Such evidence would clarify such potential issues as whether, if such a further modification occurred, it would constitute a breach by Plaintiff (excusing performance) or, by contrast, merely appropriate mitigation by Plaintiff in light of Defendant's continued nonpayment.

nonpayment, in whole or in part, constitutes a breach of any such implied contract. Thus, summary judgment is again inappropriate.

### C. Count III: Quantum Meruit/Unjust Enrichment

Plaintiff's third argument is based on the doctrines of quantum meruit and unjust enrichment. These "quasi-contract causes of action, are remedies to provide relief for a plaintiff when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation for services provided." *Dunnaville v. McCormick & Co., Inc.*, 21 F.Supp.2d 527, 535 (D. Md. 1998) (internal quotations omitted); *see also FLF, Inc. v. World Publications, Inc.*, 999 F.Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties."). The Maryland Court of Appeals has clearly held that "quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists." *County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 101 (2000). Here, Plaintiff asserts that an express contract existed and governed the parties' business relationship and conduct. Accordingly, Plaintiff's claim for quantum meruit/unjust enrichment is inapplicable and summary judgment will not be granted.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (ECF No. 17) is DENIED. A separate Order shall follow.

Dated: April 20, 2018                             /s/
                                                  J. Mark Coulson
                                                  United States Magistrate Judge